# United States Tax Court

T.C. Memo. 2024-104

IQ HOLDINGS, INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 10608-20.                                  Filed November 7, 2024.

————————

*Larry A. Campagna, George R. Gibson, Peter A. Lowy, Leo Unzeitig*, and *Daizia M. Williams*, for petitioner.

*Steven D. Garza, Mary E. Morey*, and *William D. White*, for respondent.

## MEMORANDUM OPINION

COPELAND, *Judge*: The Commissioner sent a Notice of Deficiency to Petitioner, IQ Holdings, Inc. (IQH), determining a deficiency of $2,869,975 for IQH's 2014 tax year and a $622,061 accuracy-related penalty under section 6662(a).[1] The deficiency determination stems from the Commissioner's disallowance of the following three categories of deductions: (1) writeoffs for damaged inventory, (2) charitable contributions, and (3) net operating loss (NOL) carryforwards. This case is before the Court on the Commissioner's Motion for Summary Judgment.

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[*2]                                    *Background*

The following background statement is drawn from the parties' pleadings and Motion papers and the attached Declarations and Exhibits. We state the background solely for purposes of ruling on the Commissioner's pending Motion for Summary Judgment and not as findings of fact. IQH's principal place of business was in Texas when it timely filed its Petition.

I.    *Entities*

During tax year 2014 IQH was a C corporation[2] based in Houston, Texas, and owned entirely by Pradeep Yohanne Gupta and his wife. IQH filed its calendar-year 2014 Form 1120, U.S. Corporation Income Tax Return, as a consolidated return with its subsidiary, IQ Products Co. (IQP). In 2014 IQP was an active manufacturer of aerosol consumer products, including products for personal and home care and automotives. In 2012 Mr. Gupta founded IQ Life Sciences Corp. (IQLS), which he intended to be a nonprofit organization dedicated to designing and donating pharmaceutical and healthcare products, focusing particularly on respiratory ailments. IQLS applied for status as a tax-exempt private foundation under section 501(c)(3) in March 2012 and received approval from the Internal Revenue Service (IRS) on November 14, 2014.

II.   *Inventory Writeoffs*

While IQLS's application for tax exemption was pending, IQP made a seller-financed sale (in exchange for a note) to IQLS of inventory consisting of more than 1,000 pallets of IQ-branded aerosol products and raw packaging materials. IQP intended to forgive the loan once IQLS received its section 501(c)(3) approval. However, by the time IQLS got that approval in 2014, some or all of the aerosol products and packaging materials were found to be rusted, leaking, broken, or otherwise damaged. As a result, IQLS and IQP decided to reverse the sale.[3] After reversal, IQP wrote off the cost of the aerosol products (in the amount of $3,401,095) and the raw packaging materials ($1,280,626) on its books

---

[2] *See* I.R.C. § 1361(a)(2). C corporations are taxable separately from their shareholders. *See* I.R.C. § 11.

[3] It is unclear from the record how IQP accounted for the reversal on its books and records (e.g., whether it canceled the note and booked inventory in a like amount, reversed any income previously recorded, or otherwise).

**[*3]** and records and on its 2014 tax return, which increased its cost of goods sold by those amounts. During 2016, while the IRS was examining IQH's 2014 tax return, IQP was still in the process of "decommissioning" the aerosol cans by puncturing the bottom of each can, collecting the liquid contents, and preparing the cans and liquid for disposal or recycling.

Also for the 2014 tax year IQP wrote off $1,672,555 worth of aerosol can inventory (approximately 1.5 million cans) that was originally manufactured for the WD–40 Co. (IQP again charged that amount to cost of goods sold on its 2014 return.) In 2012 IQP had discovered a design defect in the cans that left them in violation of Department of Transportation (DOT) regulations; that violation was communicated by letter from the DOT to IQP in October 2012. As of April 2017 IQP still had physical possession of the aerosol cans and was in litigation with the WD–40 Co. over who owned them. In a signed Declaration, Mr. Gupta explained:

> At the end of 2014, my team and I, based on our experience manufacturing and selling these products since 1989, determined that the WD–40 products were worthless. They were defective, illegal to sell, and illegal to transport. Any attempt to rehabilitate the products would have greatly exceeded the cost of producing new products.

III. *Charitable Contribution Deductions*

IQH reported total charitable contributions of $2,932,168 on its 2014 tax return. As delineated on the return, this amount reflected (1) equipment valued at $162,725, (2) residential property at 720 Ourlane Circle, Houston, Texas, valued at $1,400,000, and (3) $1,369,443 in cash. IQH reported that all of these items were donated to IQLS. IQH claimed a 2014 deduction of $325,288, in accordance with the percentage limitation on the charitable contribution deduction for corporations under section 170(b)(2).[4]

The equipment donation consisted of computer network equipment, computer software, and analytical laboratory equipment.

---

[4] The excess over that percentage limitation typically may be carried to succeeding tax years. Specifically, section 170(d)(2) generally provides that a corporation whose total charitable contributions in a given tax year exceed 10% of its taxable income—as adjusted per section 170(b)(2)(D)—may carry over the excess for up to five succeeding tax years.

[*4] According to IQH, it initially recorded the transfer of equipment to IQLS in 2012 as a seller-financed loan and forgave the loan once IQLS received its section 501(c)(3) approval in 2014.[5]   Likewise, IQH represents that it sold the 720 Ourlane property to IQLS on credit in 2012 and forgave the $1,400,000 loan in 2014.[6]   The reported cash donation derives from the purchase of residential property located at 728 Ourlane Circle, Houston, Texas, from a third party in 2013.  IQP and IQH together paid $1,369,443 on IQLS's behalf for the property, which was titled in IQLS's name.[7]   IQH represents that it and IQLS recorded a loan to IQLS in the amount of the purchase price and that IQH forgave the loan in 2014.  With respect to all three purported loans, Mr. Gupta represented in a signed Declaration that IQH and IQLS "executed" a contemporaneous "loan agreement" and made corresponding entries in their books of account (viz, accounts receivable and accounts payable, respectively).  The record so far contains no loan documents, no loan forgiveness documents, no evidence of the alleged book entries, and no evidence of any interest or principal payments.

IQH did not obtain an appraisal of the equipment before filing its 2014 return.  For the real estate at 720 Ourlane Circle, it attached a printout of a webpage from the Harris County (Texas) Appraisal District, indicating both a "market" and "appraised" valuation of the land and improvements at that address of $1,971,053 as of January 1, 2015.

On audit, IQH provided the IRS with a letter from IQLS to IQH dated December 29, 2014, stating in relevant part as follows:

> This letter serves to confirm receipt of the listed items below as a donation from IQ Holdings, Inc.
>
> - Residential property located at 720 Ourlane Circle, Houston, Texas 77024.

---

[5] The Commissioner alleges that the equipment did not change physical location after either the 2012 loan or the 2014 forgiveness, and IQH has not denied this allegation.

[6] Mr. Gupta transferred the property to IQH in 2009, and IQH deeded the property to IQLS on December 28, 2012.

[7] IQP remitted a $100,000 escrow check to the property owner and IQH wire-transferred $1,269,443 to the title company.

[*5]   • The sum of $1,369,442.88 that was paid on our behalf to purchase the residential property located at 728 Ourlane Circle, Houston, Texas 77024.

• Various equipment valued at $162,725.

IQ Life Sciences Corporation intends to sell the residential properties and equipment and use this money strictly for IQ Life Sciences Corporation's charitable Mission.

IV.   *NOLs*

IQH claimed an NOL carryforward deduction of $4,702,585 on its 2014 tax return.   IQH and the IRS later agreed that the highest potential NOL carryforward for 2014, $4,897,991, is based on a potential carryforward of the following NOLs:

| Year | Potential NOL Carryforward |
|------|---------------------------|
| 2010 | $415,755 |
| 2011 | 1,785,353 |
| 2012 | 423,591 |
| 2013 | 2,273,292 |
| **Total** | **$4,897,991** |

IQH did not check the box on line 11 of Schedule K, Other Information, of any of its 2010–13 Forms 1120.  On each of those Forms that line instructed, in relevant part: "If the corporation has an NOL for the tax year and is electing to forgo the carryback period, check here."[8] Nor did IQH attach a statement to any of those Forms 1120 indicating its intent to forgo the carryback period.  IQH never submitted an amended return or other filing to claim a tax refund on account of carrying back any of the 2010–13 NOLs to a previous tax year.

The Commissioner alleges that (1) IQH's net income reported for tax year 2008 exceeds the 2010 NOL, and IQH's 2008 tax year remains open for refund claims because of a mutual agreement to extend the period of limitations; (2) IQH's net income reported for tax year 2009

---

[8] As in effect for calendar years 2010–13, section 172 provided that an NOL incurred in a given tax year should be carried back (as a deduction) to the two preceding years and, if not fully absorbed, carried forward for up to 20 succeeding years.  As discussed below, taxpayers could elect to forgo the carryback period, but only by making an affirmative election pursuant to instructions from the Secretary of the Treasury.

[*6] exceeds the 2011 NOL, but the period of limitations for claiming a refund with respect to IQH's 2009 tax year has closed; and (3) the 2012 NOL stems from an inventory writeoff of $837,550, but on audit IQH did not produce sufficient records to substantiate the writeoff and was still in possession of the subject inventory. IQH disputes that its records for the 2012 writeoff are insufficient, but it neither confirms nor denies the Commissioner's first two allegations.[9]

V.    *Notice of Deficiency*

IQH mailed a timely Petition that was received by this Court on July 15, 2020, contesting the Notice of Deficiency mailed by the IRS on January 30, 2020.[10] In the Notice of Deficiency, the Commissioner determined an income tax deficiency for IQH's 2014 tax year of $2,869,975 and an accuracy-related penalty under section 6662(a) of $622,061. The deficiency determination is based on (1) disallowance of IQH's $6,354,276 increase to cost of goods sold on account of damaged or obsolete inventory, (2) disallowance of IQH's charitable contribution deduction of $325,288, and (3) a net reduction of $1,722,435 to IQH's NOL deduction.[11]

*Discussion*

I.    *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). Under Rule 121(a)(2), we may grant summary judgment when there is no genuine dispute as to any

---

[9] The Commissioner produced copies of IQH's 2010–13 filed tax returns. The record to date does not contain IQH's return for tax year 2008 nor 2009 nor any evidence relevant to the 2012 inventory writeoff.

[10] Section 6213(a) provides that taxpayers with a U.S. address must file a petition contesting a notice of deficiency within 90 days from the date that the notice was mailed (not counting Saturday, Sunday, or a legal holiday in the District of Columbia as the last day of the 90-day period). Therefore, IQH's Petition normally would have been due by April 29, 2020. However, in I.R.S. Notice 2020-23, 2020-18 I.R.B. 742, the Commissioner exercised his authority under section 7508A(a) to set an extended due date of July 15, 2020, for Tax Court petitions due between April 1 and July 14, 2020 (on account of the COVID–19 public health emergency). Therefore, IQH's Petition was timely filed.

[11] IQH claimed an NOL deduction of $4,702,585 on its 2014 return. The Commissioner allowed the 2013 carryover of $2,273,292 and a 2015 carryback of $706,858, yielding a net adjustment of $1,722,435.

**[*7]** material fact and the moving party is entitled to judgment as a matter of law. *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). The burden is on the moving party to demonstrate that no genuine dispute as to any material fact remains and that it is entitled to judgment as a matter of law. *FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74–75 (2001). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. *Sundstrand Corp.*, 98 T.C. at 520 (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); and then citing *Naftel v. Commissioner*, 85 T.C. 527, 529 (1985)). However, the nonmoving party may not rest upon the mere allegations or denials in its pleadings but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); *Sundstrand Corp.*, 98 T.C. at 520.

II.  *Inventory Writeoffs*

Section 471(a) provides:

> Whenever in the opinion of the Secretary [of the Treasury] the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Treasury Regulation § 1.471-2(a) states that section 471(a) provides "two tests to which each inventory must conform: (1) It must conform as nearly as may be to the best accounting practice in the trade or business, and (2) It must clearly reflect the income." The Supreme Court has remarked that "best accounting practice" is synonymous with "generally accepted accounting principles" (GAAP) and that section 471 "vest[s] the Commissioner with wide discretion in determining whether a particular method of inventory accounting should be disallowed as not clearly reflective of income." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979).

**[\*8]**    IQH contends that its \$6,354,276 writeoff of inventory for 2014 was consistent with GAAP.[12]  The Commissioner does not dispute that contention but supports his deficiency determination by arguing that the writeoff does not clearly reflect IQH's income.  He points to Treasury Regulation § 1.471-2(c), which generally provides that businesses may value inventory at either (1) cost or (2) the lower of cost or market price.  However, that regulation then sets forth a significant caveat:

> Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition . . . or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value.  Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date.  The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made.

---

[12] As of December 31, 2014, Paragraph 330-10-35-1 of the Financial Accounting Standards Board's (FASB) Accounting Standards Codification read as follows:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as their cost.  Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

FASB, Accounting Standards Codification, 330-10-35-1 (Mar. 13, 2015), https://asc.fasb.org/archiveContent/3123462/1618858; *see United States v. Winstar Corp.*, 518 U.S. 839, 855 (1996) (describing the FASB as "the font of GAAP").

**[*9]** *Id.* The Commissioner notes that IQP never offered for sale the damaged aerosol products or WD–40 cans, and he therefore concludes that IQH's writeoff did not comply with the regulation.[13]

However, we first note that Treasury Regulation § 1.471-2(c) encompasses inventory "unsalable at normal prices" but does not explicitly deal with inventory that is unsalable at *any* price, as IQH contends was the case with its aerosol products and WD–40 cans. The parties agree that the Supreme Court has recognized that defective inventory may be written down for tax purposes in some circumstances. *See Thor Power Tool Co. v. Commissioner*, 439 U.S. at 535. Not addressed by the Supreme Court in *Thor Power Tool Co.* are situations in which the inventory is completely obsolete, hazardous, or illegal to sell, or in which the inventory's scrap value is zero. IQH posits that those are instances to which the regulation's general requirement to hold the property out for sale cannot apply, since holding such items out for sale would be nonsensical. IQH cites a district court case in support of its proposed exception.[14]

We agree with IQH that Treasury Regulation § 1.471-2(c) cannot be read to require a taxpayer to offer for sale items that, in their current condition, would be tortious or illegal to sell. Moreover, solely for purposes of ruling on the Commissioner's Motion for Summary Judgment, we construe the record in the light most favorable to IQH. *See Sundstrand Corp.*, 98 T.C. at 520. Consequently, we must assume that both the IQ-branded aerosol products and the WD–40 cans were tortious or illegal to sell in 2014, precluding us from resolving the issue summarily on the basis that the goods were not actually held out for sale.

However, as to the WD–40 cans only, we must also address the Commissioner's contention that even if IQH was not required to offer

---

[13] In the Commissioner's Sur-Reply to IQH's Objection to Motion for Summary Judgment, the Commissioner conceded that the raw packaging materials in the amount of $1,280,626 written off by IQP are exempt from the "actual offering of goods" provision of the regulation. (Rather, they need only be "valued upon a reasonable basis.") The Commissioner therefore retracted his Motion with respect to those raw material costs. Further references to "inventory" in this Opinion will exclude the raw materials.

[14] *See Queen City Woodworks & Lumber Co. v. Crooks*, 7 F. Supp. 684, 685 (W.D. Mo. 1934) ("To enforce [the actual offering price requirement] strictly would be unjust to the taxpayer if its goods were in fact worthless. There would be no demand for an obsolete device.").

**[\*10]** them for sale before writing off their inventory value, IQH may not claim a writeoff for 2014 because it knew as early as 2012 (when IQP exchanged letters with the DOT) that the cans were illegal to sell. Yet the Commissioner does not consider the possibility (which may be affected by other issues in this case) that a 2012 writeoff of the WD–40 cans would increase IQH's 2012 NOL and thus, through the NOL carryforward provisions, affect IQH's 2014 tax liability.[15] Moreover, Mr. Gupta in his Declaration represented that it was not until the end of 2014 that he and his team determined that "[a]ny attempt to rehabilitate the [WD–40] products would have greatly exceeded the cost of producing new products." In the absence of evidence that IQH was negligent in not making this determination before 2014, we cannot summarily say the 2014 writeoff was improper.

Therefore, we cannot grant the Commissioner summary judgment with respect to the writeoff of either the IQ-branded aerosol products or the WD–40 cans. Rather, we must await further evidence regarding the salability of these products as well as IQH's knowledge of (and efforts to determine) whether they could be feasibly rehabilitated.[16]

### III. *Charitable Contribution Deductions*

Section 170(a) allows a deduction for contributions made to charitable organizations during the tax year. While deductible contributions typically occur by outright conveyance of cash or property, deductions may be allowed in certain other cases, such as gratuitous debt forgiveness. *See Story v. Commissioner*, 38 T.C. 936, 942 (1962). In order for a taxpayer to claim a charitable contribution deduction for forgiving debt owed by a qualified charitable organization, we require that the initial loan be valid and enforceable, but not that forgiveness be

---

[15] Our caselaw supports reviewing a deduction for an earlier year that affects an NOL carryover deduction for the current year. *See* I.R.C. § 6214(b) ("The Tax Court in redetermining a deficiency of income tax for any taxable year . . . shall consider such facts with relation to the taxes for other years . . . as may be necessary correctly to redetermine the amount of such deficiency . . . ."); *see also Zarlengo v. Commissioner*, T.C. Memo. 2014-161, at \*26 (denying carryover deductions for the taxpayer's 2005–07 tax years (which were before the Court) after finding that she did not meet the requirements for a deduction for her 2004 tax year (which was not before the Court)).

[16] Because we are denying the Commissioner summary judgment for the reasons indicated above, we need not here address IQH's alternative arguments that (1) the aerosol products and WD–40 cans were not inventory but rather "partly finished goods" (to be valued "upon a reasonable basis," per Treasury Regulation § 1.471-2(c)) or (2) IQH qualifies for a loss deduction under section 165(a) with regard to the inventory damage, even if it does not qualify for a writeoff under section 471.

**[\*11]** wholly unforeseen: "The mere fact that the original payee [i.e., the eventual donor] indicated he might or might not attempt to collect on the notes, or that he might forgive all or portions of them in the future, makes the notes no less binding obligations until the events occurred which would relieve the obligation." *Id.* at 942.

Section 170(f) denies a deduction under section 170(a) for any contribution of $250 or more unless the taxpayer receives from the donee a "contemporaneous written acknowledgment" (Acknowledgment) of the contribution that "includes the following information":

> (i) The amount of cash and a description (but not value) of any property other than cash contributed.
> (ii) Whether the donee organization provided any goods or services in consideration, in whole or in part, for any property described in clause (i).
> (iii) A description and good faith estimate of the value of any goods or services referred to in clause (ii) . . . .

I.R.C. § 170(f)(8)(B). The donor must be in receipt of the Acknowledgment by the earlier of the date it files the relevant tax return or the return's due date. I.R.C. § 170(f)(8)(C).

Further, section 170(f)(11)(C) denies a charitable contribution deduction of $5,000 to $500,000 for a contribution of property unless the taxpayer obtains a "qualified appraisal" of the property and attaches to its return a summary of the appraisal. *See* Treas. Reg. § 1.170A-13(c)(2).[17] Under section 170(f)(11)(D), a deduction of over $500,000 requires the taxpayer to attach both an appraisal summary and a copy of the full appraisal report. According to Treasury Regulation § 1.170A-13(c)(3), a qualified appraisal generally is a valuation document prepared by a qualified appraiser not more than 60 days before the contribution and not later than the due date of the relevant tax return. There is an exemption from the qualified appraisal rules for contributions of (among other things) cash, publicly traded securities, and inventory. I.R.C. § 170(f)(11)(A)(ii)(I).

The Commissioner argues that the entirety of IQH's 2014 charitable contribution deduction should be disallowed because (1) the

---

[17] Treasury Regulation §§ 1.170A-16 and 1.170A-17 contain rules similar to those in Treasury Regulation § 1.170A-13 but apply to contributions made after July 30, 2018, and January 1, 2019, respectively. *See* Treas. Reg. §§ 1.170A-16(g), 1.170A-17(c).

**[\*12]** contributions occurred in 2012 and 2013; (2) IQH did not relinquish dominion and control over the equipment by 2014 and so did not make a completed gift in that year; (3) the letter from IQLS to IQH dated December 29, 2014, does not specify whether IQLS provided any goods or services in consideration for the donations and so fails the Acknowledgement requirement of section 170(f)(8)(B); and (4) IQH neither obtained nor attached a qualified appraisal and/or proper appraisal summary for the equipment or the 720 Ourlane property.[18]

We agree with the Commissioner that the Acknowledgment requirement of section 170(f)(8)(B) precludes any 2014 charitable contribution deduction for IQH. The letter of December 29, 2014, from IQLS to IQH "confirm[s] receipt of the listed items below as a donation" but nowhere explicitly indicates whether IQLS "provided any goods or services in consideration, in whole or in part," I.R.C. § 170(f)(8)(B)(ii), for the three listed items (equipment, 720 Ourlane Circle property, and cash for the purchase of the 728 Ourlane Circle property).[19] As we have said many times, an Acknowledgment must explicitly state whether consideration was provided for the contributed property even if the donor did not actually receive any consideration.[20] No deduction will be allowed if the Acknowledgment does not include this mandatory statement. *See, e.g.*, *Campbell v. Commissioner*, T.C. Memo. 2020-41, at \*24; *French v. Commissioner*, T.C. Memo. 2016-53, at \*8; *Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*92–93; *Durden v. Commissioner*, T.C. Memo. 2012-140, 103 T.C.M. (CCH) 1762, 1764; *Friedman v. Commissioner*, T.C. Memo. 2010-45, 99 T.C.M. (CCH) 1175, 1178. "The deterrence value of [a total denial of a deduction in the case of an improper Acknowledgment] comports with the effective administration of a self-assessment and self-reporting system." *Addis v. Commissioner*, 374 F.3d 881, 887 (9th Cir. 2004), *aff'g* 118 T.C. 528 (2002).

---

[18] The Commissioner contends that the equipment (with respect to which IQH claimed a deduction of $162,725) was subject to the appraisal summary requirement and that the 720 Ourlane property (with respect to which IQH claimed a deduction of $1,400,000) was subject to the full appraisal requirement.

[19] In fact, the Commissioner alleges that Mr. Gupta continued to use the 720 Ourlane Circle property as his primary residence after the charitable transfer. If so, IQLS may have provided goods or services in consideration for the transfer.

[20] If the donor did receive some consideration, the charitable deduction is not thereby disallowed. Rather, the deduction is then limited to the excess of the donated property's value over the value of the goods or services received in return. *See* Treas. Reg. § 1.170A-1(h)(2).

**[\*13]** IQH contends that because IQLS's letter used the word "donation," the letter sufficiently implied that IQLS gave no goods or services in exchange for the contributions. However, the word "donation" is consistent with a gratuitous transfer that is nonetheless reciprocated to some extent by the donee. *Cf. Brooks v. Commissioner*, T.C. Memo. 2022-122, at \*12 ("We do not find that use of the word 'donation' necessarily implies that there was no consideration given, in whole or in part."), *aff'd*, 109 F.4th 205 (4th Cir. 2024); *Campbell*, T.C. Memo. 2020-41, at \*24 (finding the phrase "generous gift" insufficient to satisfy the requirement that the Acknowledgment specify whether any goods or services were given in exchange).[21]

IQH argues that the omission in the letter should be excused by the doctrine of substantial compliance. That doctrine is designed to avoid hardship in cases where a taxpayer does all that is reasonably possible to comply with the specific requirements of a provision but nonetheless fails to comply. *Samueli v. Commissioner*, 132 T.C. 336, 345 (2009). This Court has held that "substantial rather than literal compliance may be sufficient to substantiate a charitable contribution deduction in certain instances." *Consol. Invs. Grp. v. Commissioner*, T.C. Memo. 2010-158, 100 T.C.M. (CCH) 51, 54. However, we have generally held that the doctrine of substantial compliance does not apply to excuse a failure to strictly comply with the Acknowledgment requirement of section 170(f)(8)(B), because that requirement is more than merely procedural and instead goes to the heart of the statutory purpose. *See 15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 562–63 (2016); *French*, T.C. Memo. 2016-53, at \*8; *Crimi*, T.C. Memo. 2013-51, at \*85; *Averyt*, 104 T.C.M. (CCH) at 67; *Durden*, 103 T.C.M. (CCH) at 1763–64. We have observed that the essential statutory purpose of the Acknowledgment requirement is to assist taxpayers in determining the deductible amounts of their charitable contributions and to assist

---

[21] It appears that this Court has permitted only one narrow exception to the requirement that the Acknowledgment contain an explicit statement regarding quid pro quos. Specifically, we have held that a deed of gift (such as a deed granting a conservation easement) that does not recite specific consideration nonetheless can suffice as an Acknowledgment when it states that the grant is unconditional and also includes an "integration" or "merger" clause to the effect that the deed constitutes the entire agreement between the parties. *See, e.g.*, *RP Golf, LLC v. Commissioner*, T.C. Memo. 2012-282, at \*10–11; *Averyt v. Commissioner*, T.C. Memo. 2012-198, 104 T.C.M. (CCH) 65, 68; *see also Brooks*, T.C. Memo. 2022-122, at \*11–13 (finding that an easement deed failed as an Acknowledgment because it lacked a merger clause); *French*, T.C. Memo. 2016-53, at \*12–13 (same). In those cases where we allowed an exception, the merger clause did not merely imply but *entailed* that no consideration was given. The IQLS letter does not support a comparable logical deduction.

[*14] the IRS in processing tax returns on which charitable contribution deductions are claimed. *Durden*, 103 T.C.M. (CCH) at 1763 (citing, inter alia, H.R. Rep. No. 103-111, at 785 (1993), *reprinted in* 1993-3 C.B. 167, 361); *see also* Treas. Reg. § 1.170A-1(h)(2).

Apart from this Court's own precedents on the substantial compliance doctrine, we are precluded from applying that doctrine in this case by precedent from the U.S. Court of Appeals for the Fifth Circuit, to which this case is appealable absent a contrary stipulation by the parties. *See* I.R.C. § 7482(b)(1)(B).[22] The Fifth Circuit recently concluded, in reference to the Acknowledgment requirement, that "[t]he doctrine of substantial compliance may support a taxpayer's claim where he or she acted in good faith and exercised due diligence but nevertheless failed to meet a *regulatory* requirement. We cannot accept the argument that substantial compliance satisfies *statutory* requirements." *Izen v. Commissioner*, 38 F.4th 459, 462 (5th Cir. 2022) (footnote omitted), *aff'g* 148 T.C. 71 (2017).

Finally, we note that there is no "reasonable cause" exception to the Acknowledgment requirement, as there is to the requirement for qualified appraisals. *See* I.R.C. § 170(f)(11)(A)(ii)(II); *Campell*, T.C. Memo. 2020-41, at *28 n.16 (noting that the reasonable cause exception for qualified appraisals does not apply to the Acknowledgment requirement). We therefore will grant summary judgment to the Commissioner on the issue of fully disallowing IQH's 2014 charitable contribution deduction.[23] *See* I.R.C. § 170(f)(8)(A) ("No deduction shall be allowed under subsection (a) for any contribution of $250 or more unless the taxpayer substantiates the contribution by [an Acknowledgement]."); Treas. Reg. § 1.170A-13(f)(1) ("No deduction is allowed under section 170(a) for all *or part* of any contribution of $250 or more unless the taxpayer substantiates the contribution with [an Acknowledgment]." (Emphasis added.)).

IV.   *NOLs*

The Code generally defines an NOL for a given tax year as the excess of the taxpayer's allowable deductions (other than the NOL

---

[22] This Court follows a court of appeals decision which is squarely on point if appeal from our decision lies to that court of appeals alone. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

[23] Because IQH failed the Acknowledgment requirement, we need not address the Commissioner's alternative arguments for disallowing the deduction.

[*15] deduction) over its gross income.  I.R.C. § 172(c) and (d).  As in effect during the relevant tax years (2010–14), section 172 provided in pertinent part as follows:[24]

> Sec. 172.  Net operating loss deduction
>
> (a) Deduction allowed.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. . . .
>
> (b) Net operating loss carrybacks and carryovers.—
>
> (1) Years to which loss may be carried.—
>
> (A) General rule.—Except as otherwise provided in this paragraph,[25] a net operating loss for any taxable year—
>
> (i) shall be a net operating loss carryback to each of the 2 taxable years preceding the taxable year of such loss, and
>
> (ii) shall be a net operating loss carryover to each of the 20 taxable years following the taxable year of the loss.
>
> . . . .
>
> (2) Amount of carrybacks and carryovers.— The entire amount of the net operating loss for any taxable year . . . shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried.  The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each

---

[24] In 2017 Congress amended section 172 to (among other things) generally deny carrybacks of NOLs arising in tax years ending after December 31, 2017.  Tax Cuts and Jobs Act, Pub. L. No. 115-97, § 13302, 131 Stat. 2054, 2121–23 (2017).  In 2020 Congress again amended section 172 to provide a five-year carryback of NOLs arising in tax years beginning after December 31, 2017, and before January 1, 2021.  Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 2303(b), 134 Stat. 281, 353–54 (2020).  Henceforth, all references to and citations of section 172 will be to the relevant provisions as in effect during 2010–14.

[25] The various listed exceptions do not apply in this case.

**[\*16]** of the prior taxable years to which such loss may be carried.

. . . .

(3) Election to waive carryback.—Any taxpayer entitled to a carryback period under paragraph (1) may elect to relinquish the entire carryback period with respect to a net operating loss for any taxable year. Such election shall be made in such manner as may be prescribed by the Secretary, and shall be made by the due date (including extensions of time) for filing the taxpayer's return for the taxable year of the net operating loss for which the election is to be in effect. Such election, once made for any taxable year, shall be irrevocable for such taxable year.

Temporary Treasury Regulation § 301.9100-12T(d) provides the following directions for making the NOL carryback waiver election:

Unless otherwise provided in the return or in a form accompanying a return for the taxable year, the elections described in paragraphs (a) and (c) [including the election under section 172(b)(3)] . . . shall be made by a statement attached to the return (or amended return) for the taxable year. The statement required when making an election pursuant to this section shall indicate the section under which the election is being made and shall set forth information to identify the election, the period for which it applies, and the taxpayer's basis or entitlement for making the election.

In the Forms 1120 that IQH filed for tax years 2010–13, line 11 of Schedule K instructed: "If the corporation has an NOL for the tax year and is electing to forgo the carryback period, check here." Moreover, the Instructions for those Forms 1120 stated the following with respect to line 11 of Schedule K: "To [elect to waive the NOL carryback], check the box on line 11 and file the tax return by its due date, including extensions. Do not attach the statement described in Temporary Regulations section 301.9100-12T." Therefore, strict compliance with Temporary Treasury Regulation § 301.9100-12T(d) (which includes the qualifier "Unless otherwise provided in the return or in a form

[*17] accompanying a return for the taxable year") would have required IQH to check the box on line 11 of Schedule K.[26]

IQH argues that it substantially complied with the requirements for making the section 172(b)(3) election for each of its 2010–13 tax years because (1) at all times it intended to forgo the carrybacks, (2) it consistently carried forward its 2010–13 NOLs on subsequent years' returns, and (3) it never filed for a refund based on a carryback of any of those NOLs. However, this Court and the Fifth Circuit have held that for purposes of the NOL carryback waiver, substantial compliance requires some unequivocal manifestation of the taxpayer's intent to irrevocably forgo the potential benefits of the carryback. *See Young v. Commissioner*, 783 F.2d 1201, 1205–06 (5th Cir. 1986), *aff'g* 83 T.C. 831 (1984); *Young*, 83 T.C. at 839. The Fifth Circuit explained the matter as follows:

> The legislative history [of the Tax Reform Act of 1976] indicates that Congress intended to give taxpayers an option to exclusively carry forward net operating losses "in lieu of" first carrying them back as would otherwise be required. In providing this choice, Congress made it irrevocable; moreover, Congress required that it be made within the time allowed for filing the return in the year of loss. The statutory intent was to require the taxpayer, when making the election, to assume the risk that a carryback would later prove preferable. For example, if a taxpayer were to experience losses in succeeding years rather than the profits he expected when making the election, the irrevocability of his choice would prevent him from later changing course and carrying back a net operating loss to prior years as he might wish to do absent the election. The essence of the statute, then, is that a taxpayer unequivocally communicates his election and binds himself to his decision concerning the best use of his net operating loss.

---

[26] IQH raises some doubts about the validity of Temporary Treasury Regulation § 301.9100-12T(d) as applied to the carryback waiver for the relevant tax years. However, even if that regulation were somehow not valid as applied, the text of line 11 of Schedule K of IQH's Forms 1120, along with the relevant portion of the Instructions, would suffice to specify the "manner as may be prescribed by the Secretary," I.R.C. § 172(b)(3), for making the carryback waiver election.

**[\*18]** *Young v. Commissioner*, 783 F.2d at 1205–06.

IQH urges that no harm was done because in fact it did not "later change course" to claim a carryback of any of the 2010–13 NOLs. However, if we were to hold that taxpayers may effectively elect the carryback waiver without any contemporaneous manifestation of intent, we would render the election eminently abusable: Taxpayers could "wait and see" whether a carryback or, instead, a carryforward would be preferable and choose accordingly. *See Young*, 83 T.C. at 839 ("[A]ny other rule 'would leave room for the taxpayer to argue later that * * * [he] had never intended to make an election.'" (second and third alterations in original) (quoting *Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781 (11th Cir. 1984))). IQH protests that the *Young* decisions were made at a time before Form 1120 contained a check-the-box mechanism for the carryback waiver and so must be revisited because there is no longer any scope for "substantial compliance" as envisioned by the courts in *Young*. That is, the box on line 11 of Schedule K is either checked or it is not. However, IQH overlooks the possibility of substantially complying with Temporary Treasury Regulation § 301.9100-12T(d) by attaching the statement described therein, rather than by checking the box.

IQH contends that the "essence" of the carryback waiver, as indicated by the legislative history of the Tax Reform Act of 1976 (which introduced the waiver election, *see* Tax Reform Act of 1976, Pub. L. No. 94-455, § 806(c), 90 Stat. 1520, 1598), is to help taxpayers best use their NOLs. Thus, IQH concludes, the requirements for the carryback waiver should be construed to be as taxpayer friendly as possible. However, we must give effect to Congress's official pronouncement that the election "shall be made in such manner as may be prescribed by the Secretary" and "shall be irrevocable." I.R.C. § 172(b)(3). If Congress wanted to make the carryback waiver as taxpayer friendly as possible, it would not have made the election irrevocable.

Finally, IQH argues that there is a genuine dispute of fact relevant to whether we should apply the doctrine of equitable reformation to retroactively deem IQH to have checked the box on line 11 of Schedule K of its 2010–13 Forms 1120. Under that doctrine, courts in their discretion may admit extrinsic evidence to alter a document (typically a contract) in certain circumstances, such as when both parties were mistaken as to the document's contents or when one party fraudulently misrepresented those contents to the other party. *See Woods v. Commissioner*, 92 T.C. 776 (1989) (equitably reforming a

[*19] Form 872–A, Special Consent to Extend the Time to Assess Tax, to correct a drafting error made by the IRS); Restatement (Second) of Contracts §§ 155, 166 (Am. L. Inst. 1981).[27]

IQH alleges that it informed its certified public accountant (CPA) of its intention to waive the carryback period each year between 2010 and 2013 but that the CPA mistakenly failed to check the box on line 11 of each year's Schedule K. However, this Court has repeatedly charged taxpayers with constructive knowledge of the contents of their returns and with the ultimate responsibility for reviewing those returns before filing. *See, e.g., Allen v. Commissioner*, 128 T.C. 37, 41 (2007) ("Taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns."). Therefore, even if IQH were to present convincing evidence of scrivener's errors, we would decline to equitably reform the Forms 1120 in question.

We accordingly will grant summary judgment to the Commissioner insofar as he contends that IQH's reported 2014 NOL deduction should be reduced by the portions of the $415,755 NOL from 2010 and the $1,785,353 NOL from 2011 that should have been carried back to earlier years. However, we note that the exact amounts of the 2010 and 2011 NOLs absorbed by the required carrybacks cannot be determined without further proceedings because IQH's 2008 and 2009 returns are not in evidence.

As for the 2012 NOL carryforward to 2014,[28] the Commissioner has submitted no evidence to support his contention that IQH's 2012 loss did not materialize. That loss is premised on an inventory writeoff that the Commissioner asserts was improper. Mr. Gupta has declared that the writeoff was "correctly reported" and "documented in contemporaneous records." Because there is a genuine dispute of fact on this issue, we will deny the Commissioner summary judgment as to the amount of the 2012 NOL carryforward to 2014.

---

[27] While it is true that "[t]he Tax Court is a court of limited jurisdiction and lacks general equitable powers," *Commissioner v. McCoy*, 484 U.S. 3, 7 (1987), we have clarified that we may apply equitable principles to decide a matter over which we have jurisdiction, *Woods*, 92 T.C. at 787. What we must not do is use equitable principles to expand our statutory jurisdiction. *Id.*

[28] Both 2010 and 2011 were loss years for IQH, so the 2012 NOL cannot be carried back to either year.

**[\*20]** V.  *Final Matters*

The Commissioner has asked us to rule that the mitigation provisions of sections 1311 to 1314 do not apply to allow IQH to receive a refund of its 2009 tax on account of the 2011 NOL that should have been carried back to 2009.  (Those mitigation provisions permit both taxpayers and the IRS in certain circumstances to effectively reopen a tax year otherwise closed by the applicable statute of limitations.)  However, IQH's 2009 tax year is not before us, so we lack jurisdiction to make any ruling with respect to that year.  *See* I.R.C. § 6214(b); *Farmer v. Commissioner*, T.C. Memo. 1998-327, 76 T.C.M. (CCH) 435, 437.

The Commissioner also asks us to sustain his determination of an accuracy-related penalty under section 6662(a).  The Commissioner's grounds for this penalty are an underpayment of tax required to be shown on a return and attributable to (1) a substantial understatement of income tax, I.R.C. § 6662(b)(2), or alternatively (2) negligence or disregard of rules or regulations, I.R.C. § 6662(b)(1).  IQH argues that it does not have an underpayment to which such penalties would apply and that even if it did, it has reasonable cause for its return positions.  A taxpayer can avoid the penalties under section 6662(a) and (b)(1) and (2) to the extent it can show that it had reasonable cause for the underpayment and that it acted in good faith.  I.R.C. § 6664(c)(1).  Reasonable cause requires that the taxpayer have exercised business care and prudence as to the disputed item.  *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).  Good faith may be established by showing reliance on the advice of an independent, competent professional.  *Id.*

In support of the reasonable cause and good faith defense, IQH attached a Declaration of Mr. Gupta and indicated that it intended to introduce testimony from various corporate representatives and outside accountants to establish that it exercised ordinary business care and prudence and relied on the advice of its CPA in preparing its 2014 return.  We agree that such testimony, if found credible at trial, could counter the Commissioner's penalty determination.  For this reason, we conclude that IQH's ability to rely on the reasonable cause and good faith defense to reduce or eliminate the accuracy-related penalty under section 6662(a) presents a genuine dispute of material fact that is not susceptible to resolution by summary judgment.

Barring settlement, this case will need to go to trial on the inventory writeoff deductions, the NOL adjustments, and the accuracy-

**[\*21]** related penalty.  Under these circumstances we will grant in part and deny in part the Commissioner's Motion for Summary Judgment.

To reflect the foregoing,

*An appropriate order will be issued.*